Rtjffin, C. J.
 

 In the year 1829, the plaintiff was, by the County Court of Perqnimons, appointed guardian to his infant brother, William Long, then about eleven years old,
 
 *355
 
 and so continued until the death oí William, in the year 1838. The estate of the ward consisted of a negro girl which was allotted him in the division of the negroes belonging to his deceased father’s estate, and charged with the payment of the sum of $95 to another child by way of equality of partition. That negro the plaintiff received, and also the sum oi $123 50 from the father’s executor, as the ward’s share of the general personal estate, and thereout he paid the charge of g95 above mentioned. The bill states, the guardian hired out the negro and annually returned his guardian accounts to the County Court; and that thereon a balance of $45 44 was due to the ward at the end of the year 1835, after defraying the expenses of the ward’s tuition and the other charges on the estate. And it then further siates,
 
 that
 
 William Long was from his infancy of a feeble constitution, not capable of manual labor and therefore not fit to be put to any trade; and that, as the ward was thus incapable of gaining a livelihood by bodily labor, the plaintiff thought it his duty, as his guardian, to send him to school and give him such an education as to qualify him for some other employment, by which he might support himself; and that, for these reasons, after keeping him at country schools for several years, he placed his ward at a respectable academy up the country during the years 1836 and 1837, at an expense considerably exceeding the current pecuniary income of his property. The bill further charges, that the negro woman belonging to the ward, after becoming grown, had children, and by reason thereof no hires could be got for her after the year 1834, but that she and her family became chargeable, and in 1836 the sum of $27, and in 1S37 the sum of $48 were paid for keeping them. And the bill further charges, that, the health and constitution of his ward not becoming better at school, the plaintiff, at the earnest request of his brother and with the hope that it would essentially benefit his health and strengthen his constitution, consented that he should spend some time in the Western States, and supplied him with the necessary clothing for that purpose and money to bear his expenses. Upon all
 
 *356
 
 which transactions the plaintiff claims a balance due him in principal money in Junnary, 1838, of $669 74i. During1 the year 1838, William Long,-the infant, died, intestate, in Tennessee; and administration of his estate was granted to the defendant, who received from the plaintiff'the negro woman and her four children, which she had while under the management of the plaintiff, and sold them for the sum of $1487 50. The prayer of the bill is, that the plaintiff may out of that sum be re-paid his advances, which he avers were made in good faith by him for the reasons set forth in the bill, and were unavoidable and necessary.
 

 The answer does not deny any of the material statements of the bill, but insists, that in law the plaintiff had no authority to make expenditures for the ward or his estate, exceeding the income, and that these were not proper but extravagant expenditures, and therefore that they ought not to be re-imbursed to the plaintiff.
 

 By the consent of the parties it was referred, without prejudice, to the Master to enquire, what sums had been laid out by the plaintiff on behalf of his ward for his education and maintenance and the .charges on his property, and what was proper to b.e allowed to the plaintiff for his disbursements on that account. From the Master’s report and the evidence taken by him it appears, that William Long was from infancy sickly and of a feeble constitution, and incapable of bodily labor; that he was sent by his guardian to ordinary schools for several years, during which time the guardian charged only the small sums paid for tuition and nothing for board, though all his expenses during that period were worth $100 a year; and that he then sent him in 1836 and 1837, as charged in the bill, to a good academy in Wake county, and for this latter period .charged the sums paid by him for clothing, board and tuition. Thereupon the Master reports a balance of principal money of $425 84, due to the plaintiff for such disbursements as the Master thinks he ought, as guardian, to have made, including the charges on the estate ; and upon that he computes interest up to the date of the report, making in the whole the sum of $525 28. In ascer
 
 *357
 
 taining this sum, the Master rejected the plaintiffs charges for advances to fit oat the ward for travelling to the west, besides some other small items. No exception is taken on either side to the report; but the case has been brought on to a hearing upon the pleadings and the report and evidence, and submitted on the question, whether the guardian can maintain his claim for disbursements beyond the annual profits of the orphan’s estate.'
 

 It is the general rule, that the court will not go beyond the income of the child’s estate for maintenance and education ; and much less is the court inclined to authorize a guardian,, of his own head, to encroah on the capital of the ward’s property, for those purposes. But we conceive it is wrong to say, that those rules are so positive and strict as to admit of no exceptions. There is no doubt that the Chancellor has often taken a part of the capital for a child’s apprentice fee, or otherwise putting him out in life ; and that even for maintenance, as a matter of necessity, the capital may be so applied, when, from the possession of property, the infant cannot be entitled to maintenance as a pauper, and, from mental imbecility or want of bodily health or strength, he cannot be maintained from the profits of his property nor put out apprentice and maintained by his master. In such a case, while there is any part of the estate, it must be applied to keep the unfortunate infant alive. Our statute of 1762 preserves all the powers of the Court of Chancery over orphans and their estates ; and by the act of 1827, that power is extended to the sale of any estate, real or personal, if the court thinks such sale to the interest of the infant. The County Court may not be authorized, under the act of 1762, to do more than apply the profits of one year to the deficit of a preceding year; but the Court of Equity hath power — though it may be seldom willing to exercise it — to take the capital itself and apply it for maintenance, either future or past. It is obvious that, if in any case that can be done, the present is a proper one in which to exercise the power. It is nearly as strong as any that can be conceived. The ward was supported by the guardian
 
 *358
 
 for the greater part of his minority without any charge for clothing or board, doubtless, from fraternal affection. But being totally disqualified by nature for any employment requiring bodily labor, there was actually a physical necessity for greater expenses than the income would meet; that is, regarding income as made up of annuaal profits in money. The court then would have been obliged to order a sale of the negroes for the purpose of maintenance, or authorize the guardian to make advances upon the credit of this growing property. The question is, whether the court shall now sanction such disbursements as are deemed to have been proper, or refuse to do so upon the single ground, that the guardian did not apply and obtain the previous authority of the court. And we are free to say, that, hard as the case might be upon the guardian, making expenditures for maintenance and education from the
 
 best
 
 motives, we should, in an ordinary case, feel it our duty to let him suffer,rather than endanger the property of minors by allowing the guardian to act on his own discretion. If he chooses to advance beyond the income, he must not, in general, look to the court for assistance, but must depend on the sense of honor and justice of the ward, and his living to come of age. But we think the court ought to sustain such expenditures, when they were demanded by such circumstances, amounting indeed to physical necessity, as would have compelled every court to authorize them without a moment’s hesitation. — . This is not a case, where the guardian thought he was merely promoting the ward’s welfare by educating him for a higher walk in life than was suitable to his degree and circumstances: in such a case the guardian must be benevolent at his own expense, and not at that of the ward. But it is a ease, in which a guardian was endeavoring to save the ward’s life by removing him to a healthy situation, and there educating him, because he could be brought up to no other pursuit. That the expenditures were
 
 bona fide
 
 there can be no doubt. The plaintiff was the brother of the orphan and one of his presumptive next of kin, and made many expenditures on him gratuitously. Besides, there are
 
 *359
 
 other circumstances, which are very particular, and take this case out of the common rule. In one sense, these advances may be said to have been made out of the profits of the property, inasmuch as there was only one slave, when the plaintiff became guardian, then worth probably $300, and they increased to five in number, and were sold by the administrator for $1,487 50. Here there is a profit of nearly three times the master’s allowance to the plaintiff. But if the issue is not to be regarded as profits, properly speaking, but rather as the growth of the stock itself or increment of capital, yet it was for the interest of the infant, in a pecuniary point of view, that the guardian should make the necessary advances upon the faith of these accessions to the property, rather than by an application to the court to have the property itself sold. If this last course had been adopted and the price
 
 put to
 
 interest, there would have been an income of only $18 or $20, which would have been entirely inadequate, and required an order to apply the capital and thus exhaust it. It was much more to the advantage of all concerned, either immediately or remotely, that the guardian acted as he did. Indeed we do not see that he might not have been allowed the advances for the outfit to Tennessee, upon the same principle on which he ought to get back physician’s bills ; for eertainly the property is to be managed for the benefit of the owner, and not merely with an eye to the advantage of his heir or next of kin. But the master has not allowed that item nor several otheis, and the plaintiff submits to the report; and, therefore, the court looks no further into it. But upon the particular circumstances of this case : since the court, if applied to,
 
 must
 
 have directed these expenditures in the first instance, as they were absolutely necessary; since, upon that application, the court could only have directed the money to be raised by a sale of the negro belonging to the orphan, which would then have yielded but an inconsiderable sum; since, by not applying to the court, the slave was kept, until, with her issue, the value increased five fold — so that, in fact, the pecuniary interests of the orphan were thereby greatly promoted, instead of
 
 *360
 
 being impaired: under these particular circumstances, the court feel justified in decreeing to the plaintiff the sum reported dued to him by the master; and the defendant must also pay the costs, as a charge upon the assets in his hands.
 

 Per Curiam. Decree accordingly.